959 F.2d 235
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Margaret A. MATHIS, individually and on behalf of her late
husband, Jerry F. Mathis, Plaintiff-Appellant,
v.
ALLSTATE INSURANCE COMPANY, Defendant-Appellee.
 No. 91-5754.
 United States Court of Appeals, Sixth Circuit.
 April 8, 1992.
 
 Before RALPH B. GUY, Jr. and ALAN E. NELSON, Circuit Judges; and REAVLEY, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 A Tennessee plaintiff, who had sought to collect on a homeowner's insurance policy after her house was destroyed by fire, appeals a jury verdict rendered in favor of defendant Allstate Insurance Company, which had asserted the defense of arson. Plaintiff challenges the sufficiency of the evidence of arson, the dismissal of her claim for outrageous conduct and intentional infliction of emotional distress, the directed verdict for Allstate on her claim of bad faith, the jury instructions, and various evidentiary rulings. Finding no error, we affirm.
 
 I.
 
 2
 In 1988, Margaret and Jerry Mathis built two adjacent speculation houses in Tennessee with profits from the recent sale of their Florida home and inheritance money Mr. Mathis had recently received. These funds totalled $114,000. The newly constructed houses cost approximately $45,000 each to build. The house that burned, and in which the Mathises were then living, had been on the market for 18 months for $51,900. The other house, unoccupied at the time of the fire, was for sale for $54,900. There was no mortgage on either house.
 
 
 3
 The Mathises purchased homeowners insurance (for both houses) from defendant Allstate in June 1988. The burned house was originally insured for $50,000 plus contents coverage of $35,000. Over the next year, the Mathises periodically increased the contents coverage, so that it totalled nearly $70,000 at the time of the fire in December 1989. These increases were to cover the furniture and stereo equipment the Mathises had been buying. The premium payment for the last coverage increase was received the day before the fire.
 
 
 4
 During this time, the Mathises also purchased two new vehicles. The first of the monthly $750 loan payments became due in November 1989.[1] Toward the end of 1988, Mr. Mathis was employed as co-owner of a telemarketing service. Mrs. Mathis was unemployed, receiving disability and Social Security payments.
 
 
 5
 There were two fires on the night of December 18, 1989. It was the second which gutted the house. Mrs. Mathis testified that she was awakened by smoke at 1:30 a.m. and alerted her husband, who discovered a fire in the lower level of the house. Mrs. Mathis gathered her seven-year-old granddaughter and the family dogs and took them to the Mathises' other house. The power had been turned on in that vacant house approximately two months earlier. Mrs. Mathis then ran to a neighbor's house and called the local volunteer fire department.
 
 
 6
 When the firemen arrived, they entered the garage and found a bag of garbage and two rolls of insulation on fire. Nearby was a space heater whose cord had been burned in two. The fire was doused with 50 gallons of water, leaving the garage floor drenched. The firemen also unplugged the heater cord and dragged the heater and insulation outside. At trial, two firemen and the fire chief testified that the fire was completely extinguished when they left the scene. Plaintiff contended that the fire was still smoldering.
 
 
 7
 Mrs. Mathis and her granddaughter then returned to their other house. Mr. Mathis stayed in the garage for a while, eventually joining his wife in the other house. Twenty to 30 minutes after the firemen had gone, Mrs. Mathis, alerted by her barking dogs, looked out the front door and saw that the first house was again ablaze. She again rushed to the neighbor's house and called the fire department. By the time the firemen returned, the house was fully engulfed; 1,800 gallons of water were sprayed on it, to no avail.
 
 
 8
 For seven months following the fire, the Mathises lived in the vacant house next door, sleeping on a mattress on the floor and lacking even a kitchen table. According to plaintiffs' brief, the Mathises made an $80,000 down payment on a new home at the end of this period.
 
 
 9
 After an investigation of the fire, Allstate refused to pay the Mathises' claim. The couple's ensuing lawsuit in Tennessee state court was removed to federal district court on the basis of diversity. After a two-day trial, the jury returned a verdict for Allstate Mrs. Mathis's motion for a new trial was denied. She now appeals.[2]
 
 II.
 
 10
 Mrs. Mathis first contends that the evidence was insufficient to establish the "motive" prong of the three-part arson defense.[3] Under Tennessee law, Allstate had to prove by a preponderance not only that the fire was intentionally set and that the insured had an opportunity to set it (or had it set by someone else), but also that the insured had a motive for setting the fire. McReynolds v. Cherokee Ins. Co., 815 S.W.2d 208 (Tenn.Ct.App.1991). Our standard of review is clear. "In determining whether the evidence is sufficient to support a jury verdict, the evidence, and the reasonable inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party.... [We] must determine whether any reasonable jury could have reached the verdict based on the evidence presented at trial." MacNaughton v. United States, 888 F.2d 418, 421 (6th Cir.1989). The record reveals ample evidence from which a jury could properly conclude that Allstate had proven the arson defense.
 
 
 11
 The only evidence regarding the fire's cause came in the form of testimony by Tennessee State Fire Marshal Bill Cliett; Allstate's fire investigator, Gary Young; and forensic chemist Dennis Akin, who tested fire debris samples gathered by Young. Cliett testified that, based on his six- to seven-hour survey of the property a few days after the fire, he had concluded that the fire had been intentionally set. He ruled out accidental causes, including an electrical fire. He said he found evidence that someone had poured a liquid accelerant on the garage floor around the Mathises' pick-up truck. He also said that it would have taken at least an hour and a half, and not merely 25 minutes, for an unaccelerated, naturally burning fire to move from the garage area to the roof.
 
 
 12
 Young testified that he had examined the debris for eight hours the day after the fire and again a month later and that, in his opinion, the fire had been set deliberately with gasoline. The findings on which he based his conclusion were similar to those relied upon by Cliett, including the presence of a "fire trailer"--the marks on the concrete floor where liquid accelerant had been poured--and the tell-tale "spalling," or blistering, of the concrete due to excessive temperatures. Like Cliett, Young also found traces of accelerant in the upper levels of the house. He, too, ruled out accidental causes.
 
 
 13
 Akin testified that he analyzed the fire debris samples that Young had gathered from various locations in the garage and upper level. He said his testing detected the presence of evaporated gasoline.
 
 
 14
 Presented with such evidence, the jury properly could have concluded that the fire had been set deliberately. There was also ample evidence from which to find that the insureds had an opportunity to set the fire. They were in sole control of the house before the first fire and again before the second fire erupted. Mrs. Mathis also testified that she neither saw nor heard anyone else around the house nor saw any sign of forced entry.
 
 
 15
 Although the evidence establishing motive may not have been as plentiful as the evidence regarding the other two elements, we find that it, too, was sufficient to support the verdict. Plaintiff argues that she and her husband were in "enviable financial condition" at the time of the fire and thus had no reason to destroy their house. Allstate presented evidence putting such characterization in doubt. It pointed out that by September 1988, the $114,000 in the Mathises' bank account was depleted; their residence was still on the market after 18 months; their credit card balance exceeded $12,000; they had just begun to make monthly car payments, following Mr. Mathis's negotiation for a longer payment period; and that, for seven months after the fire, they did nothing to ameliorate their spartan existence in an unfurnished house. Allstate also pointed to the increases in the contents coverage and the receipt of the premium for the latest increase just one day before the fire.
 
 
 16
 As discussed more fully below, Allstate also presented evidence that the Mathises provided false information in their insurance application when they stated that they had had no prior insured losses. Mr. Mathis had repeated this falsity the day after the fire when he told an Allstate agent that they had never experienced any fire losses.
 
 
 17
 Finally, Allstate presented evidence that the Mathises had parked their new Chevy Blazer in the garage of the second house, that they had turned on the power in that house even though it was unoccupied, and that someone had been seen moving a box into the garage of the vacant house a week before the fire.
 
 
 18
 Despite plaintiffs' contrary evidence suggesting financial well-being, there was sufficient evidence from which the jury could conclude that the Mathises had a motive to set the blaze. We are not permitted to "set aside the jury verdict merely because the opposite conclusion could have been reached or because different inferences could have been drawn." MacNaughton, 888 F.2d at 421.
 
 III.
 
 19
 Mrs. Mathis also argues that the trial judge erred in directing a verdict for Allstate on her claim of bad faith and in dismissing her claims alleging outrageous conduct and intentional infliction of emotional distress. Allstate's conduct, she argues, contributed to her husband's untimely death by heart attack.
 
 
 20
 We review the grant of a directed verdict by the same standard used by the trial court in assessing the motion for a directed verdict. Sawchick v. Du Pont de Nemours and Co., 783 F.2d 635 (6th Cir.1986). Tennessee law provides for a bad faith penalty against an insurer if "it shall be made to appear to the court or jury ... that the refusal to pay the loss was not in good faith...." Tenn.Code Ann. § 56-7-105(a) (1989). Interpreting an earlier but substantially identical version of this Tennessee statute, we deemed it error to submit the bad faith issue to the jury where there were "[r]easonable bases for controversy" and the insurer's defenses were not "frivolous." Niagara Fire Ins. Co. v. Bryan & Hewgley, Inc., 195 F.2d 154, 157 (6th Cir.1952). As it was clear from the evidence presented at trial that Allstate's arson defense was not frivolous, the judge properly refused to allow the jury to assess a bad faith penalty against the insurer.
 
 
 21
 After Mr. Mathis died of a heart attack, Mrs. Mathis successfully moved to amend the complaint to add a claim against Allstate for $2.5 million "in compensatory and punitive damages for its outrageous conduct and intentional infliction of emotional distress which ... caused and/or contributed to [Mr. Mathis's] untimely death." Prior to trial, the judge dismissed plaintiff's claim for punitive and extracontractual damages for failing to state a claim upon which relief could be granted.
 
 
 22
 While the tort of "outrageous conduct," or intentional infliction of emotional distress, is actionable in Tennessee, "a simple allegation of a bad faith refusal to pay an insurance claim is not an allegation of 'conduct ... so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " Rice v. Van Wagoner Cos., Inc., 738 F.Supp. 252, 253 (M.D.Tenn.1990) (quoting Chandler v. Prudential Ins. Co., 715 S.W.2d 615, 622 (Tenn.Ct.App.1986)). Further, the trial judge correctly noted that the 25 percent penalty provided for in Tenn.Code Ann. § 56-7-105(a) has been deemed the exclusive remedy for losses stemming from an insurer's bad faith refusal to pay a claim. Rice, 738 F.Supp. at 254-57.
 
 
 23
 We thus find no error in the directed verdict and the dismissal of these extracontractual damage claims.
 
 IV.
 
 24
 Mrs. Mathis next argues that the trial court erred in permitting Allstate to add a "surprise" witness the day before the trial began. The witness, David Michael, a neighbor of the Mathises, testified that a week before the fire he saw a shirtless person move a heavy-looking box into the garage of the Mathises' vacant house. On cross-examination, Michael conceded that he could not be sure that the person was Mr. Mathis, and that the incident might have occurred even earlier than November, rather than just a week before the December 18 fire. Plaintiff's attorney also pursued a line of inquiry which suggested possible bias on his part against the Mathises. On this record, we cannot say that the trial judge abused his discretion in admitting Michael's testimony.
 
 
 25
 We reach the same conclusion regarding the judge's decision to admit evidence of the Mathises' prior insurance claims. On their application for the insurance policy at issue here, the Mathises stated that they had filed no insurance claims in the past. On the day after the fire, Mr. Mathis again told an Allstate representative that they had never experienced any fire losses. During Mr. Mathis's deposition, however, Allstate learned that Mr. Mathis had collected on fire, theft, and workers' compensation claims.
 
 
 26
 Although the trial judge expressed some doubt as to the relevance of the Mathises' prior theft and workers' compensation claims, he allowed Allstate to introduce evidence of all the prior claims as a method of impeachment. Allstate also sought to use these claims in suggesting that the Mathises were "insurance-wise," familiar with the claims process and the profits it can yield.
 
 
 27
 Prior insurance claims are essentially "other acts" within the meaning of Federal Rule of Evidence 404(b). The trial court enjoys "broad discretion in making a determination of admissibility" under this rule. Hammann v. Hartford Accident & Indem. Co., 620 F.2d 588, 589 (6th Cir.1980). In a case similar to the present one, in which an insurer asserted the defense of incendiarism in denying a claim, this court held that the insured's prior fire insurance claims--which he had concealed from the insurer--were admissible not only as impeachment evidence but as evidence of the insured's motive. Id. While it may be a closer case with respect to the Mathises' earlier non-fire-related claims, plaintiff fails to demonstrate that the trial court abused its discretion in ruling that the probative value of these claims was not outweighed by their potentially prejudicial effect.
 
 V.
 
 28
 Mrs. Mathis also objects to the jury instructions. She argues that the court improperly refused to charge the jury on the "innocent spouse doctrine" and to instruct that "the insured, Mathis, is not to be incriminated by not accounting for the origin of the fire." Both of these claims are meritless.
 
 
 29
 Plaintiff cites Ryan v. MFA Mutual Insurance Co., 610 S.W.2d 428 (Tenn.Ct.App.1980), in arguing that the judge should have charged the jury that, even if it linked Mr. Mathis to the fire, it could award Mrs. Mathis one-half of the insurance proceeds if she had not participated in the burning. Ryan 's innocent spouse doctrine does not apply, however, if the policy specifically states that the misconduct of any insured bars recovery by any other insured. Id. at 437. Allstate's policy in this case unambiguously stated that "acts and failures to act of a person defined as an insured person will be binding upon another person defined as an insured person."[4]
 
 
 30
 Neither did the court err in refusing plaintiff's charge regarding the effect of failure to explain the fire's origin, which instruction plaintiff requested on the basis of a 60-year-old case from the state's intermediate appellate court. Livingston v. U.S. Fire Ins. Co., 7 Tenn.App. 230 (1928). Even in diversity cases, where state law determines the substance of the instructions, federal law sets the standards by which this court reviews alleged instructional errors. Teal v. Du Pont de Nemours and Co., 728 F.2d 799, 802 (6th Cir.1984). On review, this court considers the charge as a whole to determine if the instructions fairly and adequately submitted the issues and law to the jury. Miller v. Taylor, 877 F.2d 469, 471 (6th Cir.1989). In this case, the trial judge repeatedly emphasized that the burden of proof regarding the affirmative defense of arson was on Allstate, and that the jury should return a verdict for plaintiff if they found that she and her husband did not set fire to their house. The instructions, considered in their entirety, contained no misstatement of Tennessee law.
 
 
 31
 AFFIRMED.
 
 
 
 *
 The Honorable Thomas M. Reavley, United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 Only one of the new vehicles was destroyed in the fire. The other had been parked at the second house. Mrs. Mathis continued to make payments on the burned vehicle after the fire
 
 
 [2]
 Mr. Mathis died before trial. Mrs. Mathis remained as plaintiff and was substituted as representative of her husband's interest
 
 
 [3]
 Plaintiffs' brief seems to challenge the sufficiency of the evidence only with respect to motive. As the defendant's brief sets forth the evidence presented on the other two elements as well, we will briefly consider those facts too
 
 
 [4]
 We also note that the innocent spouse's recovery, under Ryan, is to be limited to the proceeds of property "in which he can show he had the sole or major and separable interest." Ryan, 610 S.W.2d at 437. Mrs. Mathis failed to demonstrate that she had such an interest in any of the destroyed property